IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN E. OSWALD,

        Plaintiff,

  vs.                                                    No. CIV 02-1431 WPJ/LFG

UNION PACIFIC RAILROAD
COMPANY, a corporation,

        Defendant.

## MEMORANDUM OPINION AND ORDER ON
## UNION PACIFIC'S MOTION TO COMPEL AND FOR SANCTIONS

      THIS MATTER is before the Court on Defendant Union Pacific's Motion to Compel and for an Order Pursuant to Rule 35 and for Sanctions [Doc. 45]. In its motion, Union Pacific requests imposition of discovery sanctions as a result of Plaintiff's failure to produce documents and provide answers to interrogatories.

      Because a settlement conference was fast approaching at the time the motion was received, the Court conducted a prompt telephonic conference call in an effort to determine if this matter could be resolved in a telephonic hearing. Through counsel, Plaintiff objected to a telephonic resolution without first having an opportunity to file a written response. In deference to Plaintiff's request, the Court did not consider the merits of the motion at that time, but rather ordered an expedited briefing schedule.

      The Court has now received Defendant's motion and memorandum in support, Plaintiff's response in opposition, as well as Defendant's reply. Oral argument is not necessary.

Union Pacific's motion requests that Plaintiff respond fully to its First Set of Interrogatories and First Set of Requests for Production, by taking the following actions: produce copies of a journal or "ledger" and time book; sign a release for tax records and Railroad Retirement documents; and produce military records, prior work complaints, criminal history, prior claims for benefits, witness statements and medical records. Defendant also seeks an independent medical evaluation pursuant to Fed. R. Civ. P. 35.

**Factual Background**

Plaintiff John E. Oswald ("Oswald") was a locomotive engineer employed by Defendant Union Pacific. On February 2, 2000, some two months after the alleged event leading to the claim before the Court, Oswald submitted a report of personal injury or illness to Union Pacific, contending that he fell, struck his head and lost consciousness on December 5, 1999. Oswald alleges that as a result of this injury, he became legally blind, and he now seeks substantial damages in compensation.

**Discussion**

Each discovery request raised in Union Pacific's motion to compel will be discussed separately below.

Oswald's Ledger

The matter of Oswald's ledger is rather puzzling and raises some disturbing questions concerning Plaintiff's candor with opposing party and with the Court.

Union Pacific filed a separate motion to dismiss the lawsuit [Doc. 53] as a sanction due to destruction of evidence and alleged misrepresentations made in discovery, having to do with the ledger that is also at issue in this motion to compel.[1] In his response [Doc. 59] to the motion to

---

[1]That motion to dismiss is currently under consideration by the District Judge assigned to this case.

dismiss, Oswald at long last provided Defendant with a document which he asserts is the mysterious missing ledger. He now argues that no sanction is called for, since the requested ledger has been produced.

However, the document produced differs in many material respects from the one described by Oswald and requested by Union Pacific, as Defendant points out in its reply [Doc. 65] in support of the motion to dismiss. Union Pacific does not consider that its discovery request has been fully and honestly answered, and it continues to press its request that Oswald be sanctioned for his abuse of the discovery process with regard to his handling of the ledger issue. The motion to dismiss is not before the undersigned judge and will not be decided in this opinion. However, the Court finds that Union Pacific's arguments are well taken, as stated in its reply brief on the motion to dismiss, as it is clear that there are obvious discrepancies between the ledger as described by Oswald and the document which he now produces – *i.e.*, it is incomplete, it is only a copy rather than the original, and it appears to have been the work of two different people, as the handwriting differs in various parts, and no explanation is given for this difference. The Court will therefore order Oswald to produce the original copy of the entire ledger.

Because Oswald's shifting position with regard to the ledger bears on the issue of attorney fees, discussed below, the Court sets out a brief history of the parties' dispute over this document.

Oswald contends that he did not seek medical attention for his injury during the two months between December 5, 1999 and February 2, 2000, nor did he report the incident to his employer, because of threats made to him by Union Pacific supervisors. Oswald says that he recorded these

threats in a contemporaneous journal/log, or ledger[2] which he maintained, and Union Pacific now seeks production of that ledger in this motion to compel.  Defendant has made several previous attempts to obtain this ledger, as follows:

On June 28, 2001, in a recorded interview with a Union Pacific senior claims specialist, Oswald described certain documents he had created and which both he and his then-attorney promised to provide to Union Pacific to assist in its investigation of his claim.  One of these promised documents was a "time book" in which Oswald recorded his times on and off duty, as well as the amount of rest he had prior to coming on duty on December 5, 1999, the date of the accident.  Oswald also promised to produce a ledger containing the aforementioned contemporaneous notes regarding the incident, the alleged threats from the supervisors, doctor visits, conversations, and events "from the moment it happened up to – to today [*i.e.*, June 28, 2001]."  (Motion, Ex. A. Oswald Witness Statement, p. 48).

Once formal discovery began in this case, Union Pacific served interrogatories and requests for production on Oswald.  Oswald failed to timely respond and, ultimately, submitted an unsigned draft of answers and responses, stating that they were "not verified or finalized" and that they would finalized in "approximately three - five days . . .."  Oswald promised that he would produce the time book and ledger prior to his deposition, which was set for September 17, 2003.

On the day prior to Oswald's deposition, Union Pacific asked Oswald's counsel to confirm that these items would be produced.  They were not, although at the deposition, in response to questions put to him by defense counsel, Oswald disclosed that he prepared for his deposition by

---

[2]It remains unclear exactly what this document is.  To avoid confusion, the Court will refer to it as the "ledger."

4

reviewing the ledger. This ledger purportedly contains information about the threats made by supervisors to Oswald if he filed an injury report. However, at the deposition, Oswald could not recall any particulars concerning what was said or by whom, relying instead on his ledger, with its contemporaneous notes, as proof that the statements were made by the supervisors. He stated as follows:

> QUESTION: How did you know you had been awake for 20 hours at that point in time [the time of the alleged conversation with supervisors]?
>
> ANSWER: Because I remember saying that to him [one of the supervisors].
>
> QUESTION: To Mr. Hollers?
>
> ANSWER: I remember the whole, you know, it's like a bad memory, part of the things that got me fired is the testimony and I wrote it all down. I wrote a log from the day of this accident until, I would say, two years later I kept a log and I went over that log before I came in here. I went over it last night. I don't think my attorney's aware I've got it.
>
> * * *
>
> No, I don't remember. But I know I have it, and I know that, you know, I kept it I don't keep it anymore. I don't remember what was down there until I read it again [the night before the deposition], but I kept it, and it had verbatim almost everything that was said how it went down with, you know, the company officers and how I was threatened. That's why I remember now. I wouldn't have remembered if I hadn't had it down there. After I read it, I remember it very well. I remember the conversations. To this day, I can remember the conversations on the phone only because I read that thing last night. I think it's about 17 or 18 pages. I have nothing to hide, you know, if my counsel looks at it and wants to turn it

>
> over. It was my own personal recollection like I'm sure you have notes. I just kept notes because I knew --
>
> QUESTION: You kept the log because you knew what sir?
>
> ANSWER: I figured it would be a long time down the line before anything was done. And I knew that, you know, it's hard to remember things exactly how they happened, and I had already filled out a report, and I had another report I was taking and now this one. I just knew that it's, you know--
>
> QUESTION: When did you fill out this--when did you start creating this log?
>
> ANSWER: I started creating the log the afternoon after I woke up on the accident.

(Oswald Depo., 156:3-13, 157:2-15, 158:2-11).

It is clear that Oswald's ledger is relevant to his claims and to the defenses and therefore is discoverable under Fed. R. Civ. P. 26. He professes not to have independent recollection of certain events, but his recollection was refreshed as a result of his review of the ledger. Moreover, Oswald recorded critical information concerning alleged threats directed toward him by supervisors, which he now offers as justification for failing to report the accident for two months after it occurred.

According to Oswald's testimony, it is also clear that this ledger was not being kept for his attorney, as he states that his attorney didn't even know about it. Thus, the ledger cannot be exempted from discovery due to privilege. Oswald's own description of what is contained in the ledger is a virtual verbatim rendition of various conversations relating to the accident or his meeting with supervisors. He contends that this was an important ledger kept because he anticipated that he would forget details years after the event and that this ledger would help him remember.

After having so testified as to the existence of this ledger, contemporaneously made when the events were unfolding, Oswald now submits an affidavit in support of the response to the motion to compel. His affidavit testimony specifically conflicts with his prior deposition testimony. For example, in his affidavit, he says, "Long after the time I was involved in the incident, I made some notes on paper." This statement specifically contradicts the fact that his previous testimony that he commenced keeping this journal immediately after waking up from the accident. Oswald now states, "I had specifically prepared these notes for my attorney in connection with the lawsuit." This statement again is in direct conflict to his prior testimony that his attorney knew nothing of this ledger, and that this was something he had done to assist in his own recollection. Indeed, according to Oswald, he began keeping the ledger long before litigation commenced.

Oswald contends that he reviewed what he now refers to as "notes" and read them the night before his deposition, only to have the notes disappear the following day. He attributes the lost notes to his daughter's cleaning up the kitchen or to grandchildren who were doing homework on the table. Oswald claims that he is diligently searching for these notes and promises to turn them over if he locates them.

Oswald's present affidavit is drastically at odds with his prior testimony, and in a word it is simply incredible. Surely an individual who meticulously kept contemporaneous notes to allow him to recall matters of legal significance, and who was previously asked to produce those notes, would not likely have left them on the table only to have them disappear the following day, like so much rubbish. According to Oswald's deposition, these notes were extremely important because they contained near verbatim conversations and had information of time, place, individuals and other matters that were key to this litigation. It simply defies logic and common sense to accept that a

7

document of such importance to Oswald's case would merely "disappear" in this fashion.

Moreover, Oswald's attempt to somehow turn the ledger into an attorney-client privileged document on the claim that it was being prepared at his attorney's request clearly does not square with his prior sworn testimony. He claimed to have maintained this ledger from the time of the accident, presumably long before litigation was even contemplated.

In yet another twist, Oswald's attorney recently represented to the Court that Oswald "came to local counsel's office and pointed out what he deemed to be his 'ledger.'" [Doc. 59, at 1]. Presumably this document was something Oswald previously turned over to his lawyer and which was kept in the attorney's files. Counsel states that he did not recognize this document as the elusive "ledger" that Defendant had been trying so hard to obtain; rather, he says, he thought it was merely a letter setting forth Oswald's contentions.

As noted above, Union Pacific is not satisfied with this disclosure, and neither is this Court. Misrepresentations will not be tolerated. Both state and federal law provide a wide array of remedies to deal with a party who plays fast and loose with the courts. Indeed, the trial judge assigned to this case, the Honorable William Johnson, previously dismissed a plaintiff's lawsuit when evidence was presented that the plaintiff testified at trial and admitted that he had lied in his deposition and in his discovery responses. *See* Chavez v. City of Albuquerque, No. CIV 00-307 WJ/KBM. In that opinion, Judge Johnson concluded that "willful deceit . . . made a mockery of the judicial process," *citing* Chambers v. Nasco, Inc., 501 U.S. 32, 44, 111 S. Ct. 21223, 2132 (1991) ("tampering with the administration of justice . . . is a wrong against the institutions set up to protect and safeguard the public," *quoting* Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944)); *and citing* ABF Freight System, Inc. v. NLRB, 510 U.S. 317, 326, 114 S. Ct. 835, 840

8

(1994)("the gravest consequence of lying under oath is the affront to the law itself").

In the Chavez case, Judge Johnson also relied on New Mexico's substantive law set out in Sandoval v. Martinez, 109 N.M. 5, 10, 780 P.2d 1152, 1156 (Ct. App. 1989)(Hartz, J.), purpose of dismissal in case where plaintiff lied in answers to interrogatories was not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such).

The Court recognizes that it cannot order a party to produce something that does not exist. Staib v. Vaughn Indus., Inc., 171 F. Supp. 2d 714, 716 (N.D. Ohio 2001). However, the Court finds Oswald's various explanations incredible and directs that the complete, original ledger be produced within ten days.

## Tax Records

In its First Set of Requests for Production, Request No. 2, Union Pacific asks Oswald to produce all federal and state income tax returns for the past five years. Although Oswald responded that he has already produced these documents, Defendant says that it never received the records.

Oswald's tax records are relevant to his claim for damages. The Court orders that he sign an IRS release form for federal and state tax returns and W-2 forms for two years prior, and three years subsequent, to the December 5, 1999 incident at issue herein.

## Releases for Railroad Retirement Board Documents

In Request for Production No. 10, Defendant asks Oswald to produce an executed copy of the "Authority to Release United States Railroad Retirement Board Information and Records and Information attached hereto." Union Pacific states it needs these releases to obtain prior retirement applications and statements concerning injuries and other matters relevant to Union Pacific's defenses.

9

Oswald acknowledges receipt of the releases but objects on grounds that the records are confidential and production would violate his "absolute right to privacy."

Clearly, a person has a right of privacy in financial matters and in his employment records. EEOC v. Univ. of New Mexico, 504 F.2d 1296 (10th Cir. 1974). However, once a person becomes a party to litigation and places a condition in issue, the right of privacy gives way to the opposing party's right to discover evidence necessary to learn the facts, to evaluate the case, and to meet the proofs at trial. A party may not make a claim, as Oswald has here for nearly $1,000,000, and then deny the opposing party information which may well be relevant to his claims or his opponent's defenses.

In his response to the motion, Oswald does not address his refusal to execute the release forms, save for claiming that the information requested is private. The Court overrules Oswald's objection and directs that he execute and deliver the requested release forms to Union Pacific within ten days.

### Military Records

In Interrogatory No. 6, Union Pacific asks that Oswald give extensive information about his military record. Oswald objects to the lengthy interrogatory and, without waiving his objection, gives some of the information requested.

The Court finds that the military records are generally not relevant and, in any event, Oswald has adequately answered this interrogatory. He will not be ordered to provide any further military information.

### Prior Work Complaints

In Interrogatory No. 3, Union Pacific asks Oswald to state, for each post-high school

10

employer or self-employed occupation, whether he has ever made complaints to supervisors or union representatives "about performing your employment duties, working conditions or work methods," and if so, to give certain particulars. Oswald argues that this information is irrelevant and not calculated to lead to discovery of admissible evidence; Union Pacific counters that Plaintiff's prior experience making work-related complaints is relevant to show his awareness of the importance of prompt reporting.

The interrogatory is overly broad in its request for general complaints about "working conditions and work methods." The Court orders Oswald to answer the interrogatory, but only to the extent that he has made complaints to employers regarding work-related injuries.

<u>Criminal History</u>

In Interrogatory No. 5, as supplemented by a later letter, Union Pacific asks for Oswald's complete criminal history, including traffic violations. Oswald objects to this question as irrelevant and an invasion of privacy.

The Court agrees with Union Pacific that Plaintiff's credibility would be implicated if he had been convicted of a felony, or of any crime "involv[ing] dishonesty or false statement." Fed. R. Evid. 609(a). The Court directs Oswald to answer this interrogatory as to any felony convictions, and convictions of any crimes involving dishonesty or false statement. The Court will not require Oswald to provide any driver's license information except that, if Oswald has been charged with, or convicted of, any traffic violations involving his personal operation of a motor vehicle, such as speeding, that would be relevant to his claim that he is legally blind, and he is ordered to answer the interrogatory as to any such convictions after the date of his claimed injury.

### Medical Records

In Interrogatory No. 7, Union Pacific asks Oswald to provide extensive information about his medical history. When Oswald objected to the interrogatory on multiple grounds, Defendant narrowed its request in this motion, stating that it needs, but has been unable to ascertain, the location of medical records for Dr. Stephen Pierce, a doctor now deceased whom Plaintiff saw shortly before the December 5, 1999 incident. Oswald agreed to search his records for the location of Dr. Pierce's office, but he never provide the requested information. As an alternative, Union Pacific then asked Oswald to explain why he was seeing Dr. Pierce and provide information concerning the nature of his visits. Oswald declined.

Oswald's position is unreasonable. Union Pacific is entitled to know whether any condition for which Oswald sought treatment by Dr. Pierce is causally related to his present condition. Indeed, if Oswald's blindness was related to some pre-existing condition, he would be entitled to recover only for any aggravation of that condition as a result of the claimed work-related injury. Oswald is ordered to disclose, within ten days, information as to why he saw Dr. Pierce, when he saw the doctor, and the nature of the treatment the doctor provided him.

### Prior Claims for Benefits

In Interrogatory No. 11, Union Pacific asks that Oswald disclose whether he has ever made a claim for, or received, benefits under such programs as workmen's compensation, Railroad Retirement Board, military disability, group or private insurance, Social Security and like agencies. Oswald objects to this interrogatory on several grounds.

The Court overrules Oswald's objections and orders him to answer this interrogatory in full. All prior claims for benefits are highly relevant to issues in this case, including causation and

12

Plaintiff's awareness of claims procedures. Oswald is directed to produce any prior claim for benefits or, alternatively, to execute a records release allowing Defendant to secure such records from the employers, companies, organizations or agencies with whom the claims were filed.

### Witness Statements

In Interrogatory No. 12, Union Pacific asks that Oswald identify any person from whom he or his representatives have obtained statements concerning the December 5, 1999 incident or Oswald's injuries or damages.

The Court does not find this request unreasonable and it is not, as Oswald claims, overly broad. All information requested in Interrogatory No. 12 must be provided within ten days.

### Mental and Physical Examination

Union Pacific seeks to take a Fed. R. Civ. P. 35 examination of Oswald. Oswald objects and in his response in opposition, simply states that Union Pacific is not entitled to an examination. That is not correct. When a plaintiff asserts a specific claim for physical, mental or emotional injury, the plaintiff places his condition at issue, and the opposing party is entitled to an independent examination. *See, e.g.*, LeFave v. Symbois, Inc., 2000 WL 1644154, at *4 (D. Colo. April 14, 2000); Fox v. Gates Corp., 179 F.R.D. 303, 307-08 (D. Colo. 1998).

It is clear from Oswald's pleadings that this is not a "garden variety" lawsuit. Rather, Oswald has asserted a serious, specific injury, together with claims for emotional distress, and he plans to offer expert testimony in support of these claims. It is beyond dispute that Oswald has placed his physical, mental and emotional condition at issue and, thus, Union Pacific is entitled to a Rule 35 examination.

The Court authorizes Union Pacific to proceed with the examination and directs that Oswald

cooperate in scheduling. Arrangements for the examination are to be made within ten days.

## Attorney Fees

Finally, Union Pacific seeks reimbursement of its attorney fees for bringing this motion. While Oswald provided some of the disputed information prior to entry of the Court's memorandum opinion, it is equally clear that Oswald failed to provide discovery in a timely manner and that this discovery dispute was resolved only as a result of Union Pacific filing its motion to compel. The Court orders that Oswald reimburse defense counsel $450.00 as reasonable fees for bringing this motion. Payment must be made within ten days.

## **Order**

IT IS THEREFORE ORDERED that Defendant's Motion to Compel [Doc. 45] is granted in substantial part, and Plaintiff is ordered to provide all discovery as detailed above, within ten days of the date of this Order;

IT IS FURTHER ORDERED that Plaintiff pay $450.00 to counsel for Defendant, as reimbursement for attorneys fees incurred in bringing this motion, within ten days of the date of this Order.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge